IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

EUGENE VIRGIL HALL,

                Petitioner,                No. CIV S-09-2552-WBS-TJB

    vs.

M. D. McDONALD,

                Respondent.           FINDINGS AND RECOMMENDATIONS

_____/

## I.  INTRODUCTION

Petitioner Eugene Virgil Hall is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  For the following reasons, it is recommended that the habeas petition be denied.

## II.  PROCEDURAL HISTORY

On July 20, 2005, Petitioner was convicted of "assaulting Kimberly Smith with a deadly weapon causing great bodily injury, battering Smith causing serious bodily injury, battering Steven Britt, and attempting to dissuade Smith from coming to court," by a jury in Yuba County Superior Court.  Lodged Doc. 7, at 1; *see* Lodged Doc. 1, Clerk's Tr. 260.  "[T]he trial court found true allegations [that Petitioner] had five prior convictions within the meaning of the three strikes law and for purposes of the five-year enhancement statute."  Lodged Doc. 7, at 1.

1   Petitioner was sentenced to seventy-eight years to life in prison.  *Id.* at 2.

2          Petitioner directly appealed to the California Court of Appeal, Third Appellate District.

3   *See* Lodged Doc. 4.  On July 22, 2008, the California Court of Appeal issued a reasoned decision

4   reversing and remanding for resentencing or retrial on one of the prior convictions, modifying

5   custody credits, and otherwise affirming judgment.  *See* Lodged Doc. 7, at 26-27.

6          Petitioner filed a petition for review in the California Supreme Court.  *See* Lodged Doc.

7   8.  On October 22, 2008, the California Supreme Court denied the petition without comment or

8   citation.  *See* Lodged Doc. 9.

9          On September 11, 2009, Petitioner filed the original federal habeas petition.  *See* Pet'r's

10   Pet., ECF No. 1.  On November 25, 2009, Respondent filed a motion to dismiss, arguing

11   Petitioner failed to exhaust sub-issues in grounds one and three, and grounds six and seven in

12   their entirety.  Resp't's Mot. To Dismiss 2-3, Nov. 25, 2009, ECF No. 11.  In response, on

13   December 10, 2009, Petitioner filed a motion to amend his petition to delete the unexhausted

14   claims.  Pet'r's Mot. To Amend 2, Dec. 10, 2009, ECF No. 14.  On February 3, 2010, the

15   Honorable Dale A. Drozd, the assigned United States Magistrate Judge at the time, ordered

16   Respondent to either file an opposition or statement of non-opposition to Petitioner's motion to

17   amend.  *See* Order, Feb. 3, 2010, ECF No. 15.  On February 4, 2010, Respondent filed a

18   statement of non-opposition to Petitioner's motion to amend.  *See* Resp't's Non Opp'n To Pet'r's

19   Mot. To Amend, Feb. 4, 2010, ECF No. 16.  On February 10, 2010, the assigned Magistrate

20   Judge granted Petitioner's motion to amend, denied the motion to dismiss as moot, ordered

21   Petitioner to file an amended petition, and ordered Respondent to file and serve an answer.  *See*

22   Order 2, Feb. 10, 2010, ECF No. 17.

23          On March 11, 2010, Petitioner filed an amended federal habeas petition.  *See* Pet'r's Am.

24   Pet., ECF No. 18.  On June 7, 2010, Respondent filed an answer.  *See* Resp't's Answer, ECF No.

25   21.  The record does not show that Petitioner filed a traverse.

26

### III.  FACTUAL BACKGROUND[1]

On the evening of July 13, 2003, Smith, Britt, [Petitioner], and several others gathered on a driveway Smith shared with her neighbor on Almond Avenue in Yuba County.  People were drinking, including Smith.  At approximately 10:30 p.m., Smith was hit in the face with a baseball bat or stick and suffered a crushed eye socket, broken jaw, and cracked nose.  She later identified [Petitioner] as her assailant.[2]

Marcus Crans was among those who had gathered on the driveway that night and was "extremely intoxicated."  He saw Smith get hit and identified [Petitioner] as her assailant.

Steven Britt also was present on the night in question and was hit in the face.  Two days later, he identified [Petitioner] as his assailant.  At trial, however, he testified he did not see who hit him.

Laura Ann Murphy was with [Petitioner] on the night in question.  She did not see Smith get hit, but she did see [Petitioner] strike Britt in the face.  After Smith was hit, [Petitioner] asked Murphy to "agree with him" about "[w]hat had happened" and to say he had not been out of her sight all evening, even though that was not the case.

Elvin Favors, who lived near Smith, heard people partying on the night in question and went to take a look.  Through his fence, he saw three or four men "going on and on about something."  He then saw a woman approach the men and begin using foul language.  An argument ensued, and two or three of the men removed "long stick kind of things" from the back of a pickup, and "and one guy just hit her and she fell."  The men then got on top of her and began kicking and punching her.

T. A., a 12-year-old boy who also lived nearby, "heard all the commotion outside" and went to investigate.  He heard someone say, "Sean, you tell that mother fucking nigger come down here

---

[1]  These facts are from the California Court of Appeal's opinion issued on June 22, 2007.  *See* Lodged Doc. 4, at 2-6.  Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996, a determination of fact by the state court is presumed to be correct unless Petitioner rebuts that presumption with clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *see Moses v. Payne,* 555 F.3d 742, 746 n.1 (9th Cir. 2009); *Davis v. Woodford,* 384 F.3d 628, 638 (9th Cir. 2004).

[2]  Smith was interviewed at the scene and said she had been confronted by "three to four white male adults," did not "see[] her assailant," but "thought she recognized the white male holding the weapon."  Several hours later, she said she was hit by one person and identified [Petitioner] as her assailant in a photographic lineup.  At trial, she identified [Petitioner] as her assailant.  There was no doubt in her mind that he was the person who hit her.

3

and fight us.  This is bullshit.  They keep messing with us."  T. A. was interviewed later that night and identified [Petitioner] from a photographic lineup as the person who made the statement.  At trial, however, T. A. repeatedly testified he did not see [Petitioner] make the statement and did not know who made it.  Rather, he had seen [Petitioner] "partying around there" that evening.

On July 3, 2004, Deputy Christopher Heath was monitoring inmates at the Yuba County Jail when he saw an inmate in the B pod pick up a note next to the door between the A and B pods; he did not see anyone pass the note.  Heath ordered the inmate to bring him the note.  The name "Chuck Allison" appeared on the outside of the note, and the note read:  "Daryn, my respects to you over there.  Listen bro, I know your cousin or nephew Sean Couch is over there and is getting out real soon.  He knows my alleged victim Kim lives on Almond.  Tell him to handle that shit and tell . . . her not to come to court anymore.  Shit bro, she's the only one coming.  And if she don't come, I walk.  See what I'm talking about?  I send mine to you, Chuckie, and anyone else who has it coming.  Lightning bolts.  St[o]mp of the boot and right arm salute.  Lightning bolts.  Get back at me on paper and let me know."  The note was signed "Genester," and there was a swastika under the signature.  On the day the note was recovered, [Petitioner] was housed in the A pod, and Charles Allison, Sean Couch, and Daryn Carter were housed in the B pod.  "Genester" is [Petitioner's] nickname.  He has the word "Genester" tattooed on his back, and the word "Yuba" with a picture of two lightning bolts tattooed on his stomach.

[Petitioner] testified in his own defense.  He admitted having six "felony strikes," including convictions for assault.  He denied assaulting Smith or Britt.  He said Marcus Crans, Anthony Edwards, and Kenny Micardo assaulted Smith, and Anthony Edwards and Steven Shoemaker assaulted Britt.  He acknowledged that on the night of the incident, he said "Kenny and Anthony" assaulted Smith and that he did not mention Crans until trial.

[Petitioner] admitted writing the note intercepted by Deputy Heath at the jail.  He claimed he wrote it because he wanted his friends to persuade Smith to tell the truth.  He explained that the phrase "St[o]mp of the boot and right arm salute" is a "[w]hite saying when you sign of [sic] our letters to another white man" and agreed "lightning bolts" is "part of that phraseology" and the swastika commonly means "World War II Nazi Germany."

IV.  APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

An application for writ of habeas corpus by a person in custody under judgment of a state court can be granted only for violations of the Constitution or laws of the United States.  28

4

U.S.C. § 2254(a); *see also Peltier v. Wright*, 15 F.3d 860, 861 (9th Cir. 1993); *Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing *Engle v. Isaac*, 456 U.S. 107, 119 (1982)). This petition for writ of habeas corpus was filed after the effective date of, and thus is subject to, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Lindh v. Murphy*, 521 U.S. 320, 326 (1997); *see also Weaver v. Thompson*, 197 F.3d 359, 362 (9th Cir. 1999). Under AEDPA, federal habeas corpus relief also is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see also Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Williams v. Taylor*, 529 U.S. 362, 402-03 (2000); *Lockhart v. Terhune*, 250 F.3d 1223, 1229 (9th Cir. 2001).

In applying AEDPA's standards, the federal court must "identify the state court decision that is appropriate for our review." *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005). "The relevant state court determination for purposes of AEDPA review is the last reasoned state court decision." *Delgadillo v. Woodford*, 527 F.3d 919, 925 (9th Cir. 2008) (citations omitted). "Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991). To the extent no such reasoned opinion exists, courts must conduct an independent review of the record to determine whether the state court clearly erred in its application of controlling federal law, and whether the state court's decision was objectively unreasonable. *Delgado v. Lewis*, 223 F.3d 976, 981-82 (9th Cir. 2000). "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable--a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410).

"When it is clear, however, that the state court has not decided an issue, we review that question *de novo.*" *Reynoso v. Giurbino*, 462 F.3d 1099, 1109 (9th Cir. 2006) (citing *Rompilla v. Beard*, 545 U.S. 374, 377 (2005)).

## V.  CLAIMS FOR REVIEW

The petition for writ of habeas corpus sets forth five grounds for relief:

1. The trial court violated Petitioner's right to due process and to present a defense in failing to instruct the jury pursuant to CALJIC No. 2.21.2, "which instructs [the] jury they can dismiss whole testimonies due to inconsistancy [sic];" and defense counsel failed to cross examine witnesses on their inconsistent statements and on willfully false testimony.  Pet'r's Am. Pet. 4.

2. The State's improper remarks during closing arguments constituted prosecutorial misconduct and denied Petitioner a fair trial.  *Id.*

3. Petitioner was denied effective assistance of counsel because defense counsel "failed to move for acquittal on count 4" (attempt to dissuade a witness).  *Id.* at 5.

4. "The impermissibly suggestive pre-trial identification procedures and tainted in court identification of [Petitioner] violated" his Fifth and Fourteenth Amendment rights to due process.  *Id.*

5. The trial court "abused its discretion in admitting irrelavant [sic] and und[uly] prejudicial evidence."  *Id.* at 6.

Some of Petitioner's five grounds for relief overlap.  Since part of ground one, and ground three, are resolved by binding authority, they are grouped together.  Ground one is referenced more than once as it refers to separate issues.  The remaining grounds are reviewed in seriatim.  Petitioner's grounds are addressed as follows:

1. Ground One:  Failure to Give CALJIC No. 2.21.2

2. Grounds One and Three:  Ineffective Assistance of Counsel

3. Ground Two:  Prosecutorial Misconduct

1    4.  Ground Four:  Unduly Suggestive Lineup

2    5.  Ground Five:  Admission of Racial Remark Into Evidence

3    For the following reasons, Petitioner's grounds do not entitle him to habeas relief.

4    A.  Ground One:  Failure to Give CALJIC No. 2.21.2

5    In ground one, Petitioner contends that the trial court erred in failing to instruct the jury

6    sua sponte pursuant to CALJIC No. 2.21.2, regarding the believability of a witness who lies in

7    part of his or her testimony.  Respondent disputes this contention.

8    1.  State Court Decision

9    In addressing Petitioner's contention, the California Court of Appeal held as follows:

10       [Petitioner] next argues "[t]he trial court violated [his] federal
         rights to due process and to present a defense in failing to instruct"
11       the jury sua sponte in accordance with CALJIC No. 2.21.2 that it
         "may reject the whole testimony of a witness who willfully has
12       testified falsely as to a material point."[3]  He is mistaken.

13       The absence of an instruction regarding a particular factor in the
         evaluation of a witness's testimony does not establish that the jury
14       was inadequately instructed, where other, albeit more general,
         instructions for evaluating testimony are given to the jury.  (*People*
15       *v. Wader* (1993) 5 Cal.4th 610, 644-645.)  Such is the case here.

16       While the jury was not specifically instructed that it could reject
         the entire testimony of a witness it found gave willfully false
17       testimony, it was instructed that it could consider "anything that
         has a tendency reasonably to prove or disprove the truthfulness of
18       the testimony of the witnesses." (CALJIC No. 2.20.)  It was also
         instructed that it could consider a witness's prior inconsistent
19       statements "not only for the purpose of testing the credibility of the
         witness but also as evidence of the truth of the facts as stated by the
20       witness on that former occasion." (CALJIC No. 2.13.)  The jury
         was further instructed that: "[d]iscrepancies in a witness' testimony
21       or between a witness' testimony and that of other witnesses, if
         there were any, do not necessarily mean that any witness should be
22       discredited" (CALJIC No. 2.21.1); the "final test" in evaluating
         testimony is "the convincing force of the evidence" (CALJIC No.
23       2.22); and it "should give the testimony of a single witness

24  ─────────────────

         [3] CALJIC No. 2.21.2 reads:  "A witness, who is willfully false in one material part of his
25  or her testimony, is to be distrusted in others.  You may reject the whole testimony of a witness
    who willfully has testified falsely as to a material point, unless, from all the evidence, you believe
26  the probability of truth favors his or her testimony in other particulars."

                                           7

1  whatever weight you think it deserves" (CALJIC No. 2.27).

2  Viewing the instructions as a whole, we conclude the trial court did
not err in failing to instruct the jury sua sponte that it could
3  disregard a witness's entire testimony if it found that the witness
was willfully false in one part of his or her testimony.  As this court
4  observed nearly a century ago, "It should certainly not be deemed
of vital importance to tell the ordinary man of the world that he
5  should distrust the statements of a witness whom he believes to be
a liar."  (*Reynolds v. E. Clemens Horst Co.* (1917) 35 Cal.App.
6  711, 719.)  We reiterated this point two decades later in the
criminal context:  "[A]ny person of common judgment would
7  know without judicial instruction, that it is the part of wisdom and
a duty on the part of jurors to carefully scrutinize with distrust or
8  suspicion the entire testimony of a witness who has willfully
perjured himself regarding a material fact in the case." (*People v.*
9  *Kennedy* (1937) 21 Cal.App.2d 185, 201.)  These observations are
equally true today.

10

11 Lodged Doc. 7, at 8-10.

12    2.  Legal Standard of Failure to Give CALJIC No. 2.21.2 Claim

13    A challenge to a jury instruction solely as an error under state law does not state a claim

14 cognizable in a federal habeas corpus action.  *See Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991).

15 To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the

16 ailing instruction by itself so infected the entire trial that the resulting conviction violates due

17 process.  *See id.* at 72.  The instruction may not be judged in artificial isolation, but must be

18 considered in the context of the instructions as a whole and the trial record.  *Id.*  The court must

19 evaluate jury instructions in the context of the overall charge to the jury as a component of the

20 entire trial process.  *See United States v. Frady*, 456 U.S. 152, 169 (1982) (citing *Henderson v.*

21 *Kibbe*, 431 U.S. 145, 154 (1977)).

22    Even if it is determined that the instruction violated the petitioner's right to due process, a

23 petitioner can only obtain relief if the unconstitutional instruction had a substantial influence on

24 the conviction and thereby resulted in actual prejudice under *Brecht v. Abrahamson*, 507 U.S.

25 619, 637 (1993) ("The test . . . is whether the error had substantial and injurious effect or

26 influence in determining the jury's verdict."  (citation and internal quotation marks omitted)).

1    *See Hanna v. Riveland*, 87 F.3d 1034, 1039 (9th Cir. 1996).  The burden of demonstrating that an

2    erroneous instruction was so prejudicial that it will support a collateral attack on the

3    constitutional validity of a state court's judgment is even greater than the showing required to

4    establish plain error on direct appeal."  *Id.*  Where "no erroneous instruction was given[,]" a

5    petitioner's burden is "especially heavy," because "[a]n omission, or an incomplete instruction, is

6    less likely to be prejudicial than a misstatement of the law."  *Henderson v. Kibbe*, 431 U.S. 145,

7    155 (1977).

8                        3.  Analysis of Failure to Give CALJIC No. 2.21.2 Claim

9            Here, the California Court of Appeal reasonably rejected Petitioner's claim, even under

10   California law.  First, the trial court did not have an obligation to give the instruction sua sponte.

11   *People v. Wader* (1993) 5 Cal. 4th 610, 644-45, 20 Cal. Rptr. 2d 788, 854 P.2d 80.  As explained

12   in *Wader*, the trial court has a sua sponte obligation to give instructions necessary to the jury's

13   understanding of the case.  *Id.* at 645, 20 Cal. Rptr. 2d 788, 854 P.2d 80.  As in *Wader*, here, the

14   jury was instructed with CALJIC No. 2.20, which explained the jury was the sole judge of the

15   truthfulness of a witness, and it could consider anything that has a tendency reasonably to prove

16   or disprove the truthfulness of the testimony.  *See* Lodged Doc. 3, Rep.'s Tr. vol. 2, 331-32.  The

17   instruction listed several examples of facts the jury could consider, including prior inconsistent

18   statements and an admission of untruthfulness by the witness.  *Id.*  The trial court also instructed

19   the jury with CALJIC No. 2.13 (prior consistent or inconsistent statements), *see* Lodged Doc. 3,

20   Rep.'s Tr. vol. 2, 332-33; CALJIC No. 2.21.1 (discrepancies in testimony), *see* Lodged Doc. 3,

21   Rep.'s Tr. vol. 2, 332; CALJIC No. 2.22 (weighing conflicting testimony), *see* Lodged Doc. 3,

22   Rep.'s Tr. vol. 2, 333; and CALJIC No. 2.27 (sufficiency of testimony of one witness), *see*

23   Lodged Doc. 3, Rep.'s Tr. vol. 2, 333.  When combined, these instructions made it possible for

24   the jury to understand the case.  There was no duty to give CALJIC No. 2.21.2 sua sponte.

25           Second, the lack of obligation to instruct the jury sua sponte with CALJIC No. 2.21.2

26   means Petitioner was required to request the instruction if he felt it was necessary.  He did not do

                                                             9

1  so.  No error occurs when the trial court does not give an instruction that never was requested.

2  *People v. Simon*, 25 Cal. 4th 1082, 1109-10, 108 Cal. Rptr .2d 385, 25 P.3d 598 (2001).

3  Third, Petitioner did not suffer any prejudice resulting from the omission of CALJIC No.

4  2.21.2.  Petitioner argues the trial court was required to give CALJIC No. 2.21.2 sua sponte

5  because of the alleged inconsistencies in Smith's testimony.  Pet'r's Am. Pet. 4; *see also* Lodged

6  Doc. 4A, at 16.  However, there is no dispute Smith was attacked.  The only issue was who

7  attacked Smith.  Smith identified Petitioner as her attacker.  Lodged Doc. 3, Rep.'s Tr. vol. 1, 66.

8  Crans also testified that Petitioner struck Smith.  *Id.* at 116-17.  Murphy testified that Petitioner

9  asked her to lie for him, i.e., to say "[h]e had been with me the whole night," when it was not

10  true.  *Id.* at 185-86.  Murphy also recalled telling a prosecution investigator that Petitioner had

11  said, "I took care of her," referencing Smith.  *Id.* at 186-87.  Further, Petitioner's note written in

12  jail shows he wanted to convince Smith not to testify against him.  *Id.* at 178-79.  The evidence

13  of Petitioner's guilt was overwhelming, and this contention provides no basis for habeas corpus

14  relief.

15  B.  Grounds One and Three:  Ineffective Assistance of Counsel

16  In grounds one and three, Petitioner asserts his trial attorney rendered ineffective

17  assistance for:  (1) failing to cross examine certain witnesses on their inconsistent statements; and

18  (2) failing to move for an acquittal on count four (attempt to dissuade a witness).  Pet'r's Am.

19  Pet. 4-5.  After exhaustion is addressed and the legal standard is set forth, the alleged prejudicial

20  errors are addressed.

21  1.  Exhaustion

22  Respondent contends that Petitioner failed to exhaust part of Petitioner's ineffective

23  assistance of counsel claims, where Petitioner alleges defense counsel failed to cross examine

24  witnesses on their inconsistent statements.  Respondent believes "Petitioner's inclusion of this

25  sub-claim in his amended petition is inadvertent," because Petitioner had "filed a motion to

26  amend which sought to delete this sub-claim."  Resp't's Answer 15.  Because exhaustion is a

10

procedural defect that could prevent consideration of any of the claims in the current petition, *Rose v. Lundy*, 455 U.S. 509, 522 (1982) ("[W]e hold that a district court must dismiss habeas petitions containing both unexhausted and exhausted claims."), the exhaustion issue is addressed prior to addressing the claim's merits.

a. Legal Standard for Exhaustion

"Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b)(1), thereby giving the State the 'opportunity to pass upon and correct' alleged violations of prisoners' federal rights." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (quoting *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (per curiam)).  "The state courts have been given a sufficient opportunity to hear an issue when the petitioner has presented the state court with the issue's factual and legal basis." *Weaver*, 197 F.3d at 364 (citing *Duncan*, 513 U.S. at 365 (legal basis); *Correll v. Stewart*, 137 F.3d 1404, 1411-12 (9th Cir. 1998) (factual basis)).  "A petitioner has satisfied the exhaustion requirement if:  (1) he has 'fairly presented' his federal claim to the highest state court with jurisdiction to consider it[;] . . . or (2) he demonstrates that no state remedy remains available." *Johnson v. Zenon*, 88 F.3d 828, 829 (9th Cir. 1996) (citations omitted).

To have exhausted via the first avenue, a petitioner must have presented each federal claim as a federal claim to the California Supreme Court on (1) direct review (e.g., in a petition for review); or (2) collateral review (e.g., in a petition for a writ of habeas corpus). *See Reiger v. Christensen*, 789 F.2d 1425, 1427 (9th Cir. 1986); *see also O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1990); *Hiivala v. Wood*, 195 F.3d 1098, 1106 (9th Cir. 1999) ("To 'fairly present' [a] federal claim to the state courts, [a petitioner] had to alert the state courts to the fact that he was asserting a claim under the United States Constitution." (citing *Duncan*, 513 U.S. at 365-66)).  A "mere similarity between a claim of state and federal error is insufficient to establish exhaustion." *Duncan*, 513 U.S. at 366.

A claim is considered exhausted via the second avenue "'if it is clear that [the habeas

petitioner's] claims are now procedurally barred under [state] law.'"  *Gray v. Netherland*, 518 U.S. 152, 162-63 (1996) (quoting *Castille v. Peoples*, 489 U.S. 346, 351 (1989)); *see also Valerio v. Dir. of the Dep't of Prisons*, 306 F.3d 742, 770 (9th Cir. 2002) ("[T]he claim is exhausted because it is procedurally barred.").  A claim is also "exhausted because a return to state court for exhaustion would be futile." *Phillips v. Woodford*, 267 F.3d 966, 974 (9th Cir. 2001) (citation and internal quotation marks omitted).

b.  Analysis of Exhaustion

In the instant case, Petitioner failed to allege that defense counsel was deficient for failing to cross examine certain witnesses on direct appeal or in any habeas petition.  This claim is either:  (1) unexhausted because no state court reviewed it, *Johnson*, 88 F.3d at 829; or (2) exhausted because it is procedurally barred.  *Phillips*, 267 F.3d at 974 ("The district court correctly concluded that [the] claims were nonetheless exhausted because 'a return to state court for exhaustion would be futile.'" (citation omitted)).

Even if Petitioner's claim is unexhausted, an application for a writ of habeas corpus may be denied on the merits, notwithstanding the applicant's failure to exhaust available state remedies.  28 U.S.C. § 2254(b)(2).  A federal court considering a habeas petition may deny an unexhausted claim on the merits when it is perfectly clear that the claim is not "colorable." *Cassett v. Stewart*, 406 F.3d 614, 624 (9th Cir. 2005).  The merits of Petitioner's ineffective assistance of counsel claim, regarding defense counsel's cross examination of specific witnesses, will be addressed, and this matter is now ready for decision.

2.  Legal Standard for Ineffective Assistance of Counsel Claims

The Sixth Amendment guarantees the effective assistance of counsel.  The United States Supreme Court sets forth the test for demonstrating ineffective assistance of counsel in *Strickland v. Washington*, 466 U.S. 668 (1984).  An allegation of ineffective assistance of counsel requires that a petitioner establish two elements:  (1) counsel's performance was deficient; and (2) the petitioner was prejudiced by the deficiency.  *Id.* at 687; *Lowry v. Lewis*, 21

1   F.3d 344, 346 (9th Cir. 1994).

2       First, a petitioner must show that, considering all the circumstances, counsel's

3 performance fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 688. To

4 this end, a petitioner must identify the acts or omissions that are alleged not to have been the

5 result of reasonable professional judgment. *Id.* at 690. The federal court must then determine

6 whether in light of all the circumstances, the identified acts or omissions were outside the wide

7 range of professional competent assistance. *Id.* "We strongly presume that counsel's conduct

8 was within the wide range of reasonable assistance, and that he exercised acceptable professional

9 judgment in all significant decisions made." *Hughes v. Borg*, 898 F.2d 695, 702 (9th Cir. 1990)

10 (citing *Strickland*, 466 U.S. at 689).

11       Second, a petitioner must establish that he was prejudiced by counsel's deficient

12 performance. *Strickland,* 466 U.S. at 693-94. Prejudice is found where "there is a reasonable

13 probability that, but for counsel's unprofessional errors, the result of the proceeding would have

14 been different." *Id.* at 694. A reasonable probability is "a probability sufficient to undermine

15 confidence in the outcome." *Id.*; *see also Williams,* 529 U.S. at 391-92; *Laboa v. Calderon,* 224

16 F.3d 972, 981 (9th Cir. 2000).

17       A court need not determine whether counsel's performance was deficient before

18 examining the prejudice suffered by the petitioner as a result of the alleged deficiencies.

19 *Strickland*, 466 U.S. at 697. Since the petitioner must affirmatively prove prejudice, any

20 deficiency that does not result in prejudice must necessarily fail. However, certain instances are

21 legally presumed to result in prejudice, e.g., where there was an actual or constructive denial of

22 the counsel's assistance, or where the State interfered with counsel's assistance. *Id.* at 692; *see*

23 *United States v. Cronic*, 466 U.S. 648, 659 & n.25 (1984).

24           3. Analysis of Ineffective Assistance of Counsel Claims

25              a. Failure to Cross Examine on Inconsistent Statements

26   In ground one, Petitioner argues defense counsel failed to cross examine witnesses with

their inconsistent statements or their false testimony.  Pet'r's Am. Pet. 4.  Petitioner does not

specify which witnesses he believed defense counsel failed to cross examine effectively.  *See id.*

First, Petitioner cannot show that defense counsel was deficient because the record

reflects defense counsel sufficiently cross examined witnesses on their alleged prior inconsistent

statements.  The record reveals defense counsel tried to challenged Smith's testimony that

Petitioner was Smith's attacker.  On direct examination, Smith testified that Petitioner was her

attacker.  Lodged Doc. 3, Rep.'s Tr. vol. 1, 66.  On cross examination, the following occurred:

> [DEFENSE COUNSEL:]  Okay.  Do you recall telling Deputy
> Pomeroy initially that you didn't know who hit you?
>
> [SMITH:]  I don't recall that.
>
> [DEFENSE COUNSEL:]  Okay.  Did you also say at or near that
> time there were three or four individuals that hit you?
>
> [SMITH]:  I said there were two out there, two or three.
>
> [DEFENSE COUNSEL:]  Do you recall telling Sheriff Deputy
> Pomeroy that there were two or three people out there hitting you?
>
> [SMITH:]  I'm not sure.
>
> [DEFENSE COUNSEL:]  Okay.  Well, let me ask you this:  When
> you went to the hospital was it in Roseville?
>
> [SMITH:]  Yes.
>
> [DEFENSE COUNSEL:]  Do you recall telling the admitting staff
> that you were attacked by four to five -- three to four individuals
> with pipes and baseball bats?
>
> [SMITH:]  No, I don't recall that.
>
> [DEFENSE COUNSEL:]  Okay.  You don't recall that happening
> or you don't recall telling the hospital that?
>
> [SMITH:]  I don't recall telling them that.

*Id.* at 72-73.  Defense counsel then elicited on cross examination that Smith "got into an

argument with [Petitioner] because he was hitting on [her]," and she "told him no."  *Id.* at 73.

Defense counsel then attempted to challenge Smith's version of the night:

1        [DEFENSE COUNSEL:]  I can rephrase.

2        Let's talk about after 6:00 . . . .

3        [SMITH:]  After 6:00 . . . ?

4        [DEFENSE COUNSEL:]  Who was there at that gathering that you
know?

5

6        [SMITH:]  I don't know because I went home after 6:00.

       [DEFENSE COUNSEL:]  When you came -- at some point in time
7        you came out of your house, correct?

8        [SMITH:]  Yes, to go get my son.

9        [DEFENSE COUNSEL:]  And so you were inside your house from
6:00 to when?  Until you got hit?
10
       [SMITH:]  Yes.
11
       [DEFENSE COUNSEL:]  And at no time were you outside arguing
12        with the gatherers there; you were in your house the whole time?

13        [SMITH:]  Yes.

14        [DEFENSE COUNSEL:]  So if I understand correctly, 6:00 . . .
you're in your house, you come out of your house 10:30 in the
15        evening to go get your son, and then you say [Petitioner] for no
apparent reason hit you with a baseball bat, correct?
16
       [SMITH:]  Yes.
17

18 *Id.* at 74-75.  Defense counsel further elicited from Smith that she had been drinking all day.  *Id.*

19 at 77.  The record demonstrates that defense counsel sufficiently cross examined Smith about her

20 alleged inconsistent statements.

21       The record also discloses that defense counsel effectively cross examined T. A. about his

22 alleged prior inconsistent statements.  On direct examination, T. A. testified he believed he told

23 police officers he heard Petitioner say, "Sean, you tell that motherfucking nigger come down

24 here, fight us.  This is bullshit.  They keep messing with us[.]"  *Id.* at 88-89.  On cross

25 examination, the following occurred:

26        [DEFENSE COUNSEL:]  Sir, I'm sorry for being confused.  I

thought you told us you did not see the man who made the statement when he made the statement?

[T. A.:]  I did not, but that's what I told the officer.  I heard the statement being said.  I did not see who said that.

[DEFENSE COUNSEL:]  So you don't know if this man here is the one that made that statement, do you?

[T. A.:]  No, sir.  But I saw him partying around there.  But that was two years ago.  Like I said, it's very blurry.

[DEFENSE COUNSEL:]  What I'm saying is that you saw him walking around that day?

[T. A.:]  Around the area where it happened.

[DEFENSE COUNSEL:]  Where it happened.  Right.  But when you heard this statement being made, you don't know whether [Petitioner] is the one that made it or not, do you?

[T. A.:]  No, sir.

*Id.* at 89-90.  On re-cross examination, defense counsel elicited that T. A. did not know Petitioner well enough to recognize his voice, *id.* at 91, and on further re-cross examination, T. A. testified that telling the police he saw Petitioner make that statement "could have been" a "misunderstanding."  *Id.* at 92.  T. A. explained that he did not "really remember what [he] said that night" because the police kept him in the courthouse until "4:00 . . . in the morning before they even talked to [him]."  *Id.*  The record shows defense counsel effectively cross examined T. A. about his alleged inconsistent statements.

Second, Petitioner cannot demonstrate prejudice because inconsistent statements and potentially false testimony were used and explored at trial by both parties.  On direct examination by the State, Britt testified he did not see who hit him, and he did not tell the police who hit him because he "wasn't sure."  *Id.* at 111.  However, on direct examination by the State, Sergeant Wendel Anderson testified that Britt told him Petitioner "hit him in the face."  *Id.* at 114.

Additionally, although T. A. testified he did not tell police "the man that made the statement was walking around wearing a white tank top with blue jeans," *id.* at 97, the State

16

called Deputy Robby Bringolf who testified otherwise. *Id.* at 155. Specifically, Deputy Bringolf stated T. A. had told him the man who yelled the statement "was wearing a white tank with blue jeans and had brown hair." *Id.* Leslie Rose Kovach, Britt's girlfriend and Murphy's cousin, testified Petitioner was wearing a white tank top and jeans. *Id.* at 102. Kovach stated she remembers only "one or two other . . . younger kids," i.e., "teenagers," that were also wearing in a white T-shirt and jeans. *Id.*

Further, defense counsel called Deputy Joseph Pomeroy, who testified that Smith told him that "[s]he estimated three to four white mail adults had confronted her." *Id.* at 216. Deputy Pomeroy also affirmed that Smith claimed she had not seen her assailant. *Id.* And while Smith had testified earlier, "I'm sure I was hit with a baseball bat," *id.* at 76, Deputy Pomeroy stated "[Smith] wasn't sure" that she was hit with a baseball bat. *Id.* at 216. Petitioner cannot demonstrate either deficient performance or prejudice regarding cross examination of witnesses, and habeas relief is not warranted on this claim.

       b. Failure to Move for Acquittal on Count Four (Attempt to Dissuade a Witness)

In ground three, Petitioner argues counsel was deficient for failing "to move for acquittal on count 4 [attempt to dissuade a witness] at the conclusion of the prosecutions [sic] case[,]" pursuant to Section 1118.1 of the California Penal Code. Pet'r's Am. Pet. 5; *see* Lodged Doc. 1, Clerk's Tr. 92. Under section 1118.1, a criminal defendant, in a case tried before a jury, can move for "entry of a judgment of acquittal of one or more of the offenses charged in the accusatory pleading if the evidence then before the court is insufficient to sustain a conviction of such offense or offenses on appeal." "[T]he obvious purpose of section 1118.1 . . . is not to interfere with the jury process but to insure speedy acquittals of criminal charges which are not supported by substantial evidence." *People v. Odom*, 3 Cal. App. 3d 559, 565, 83 Cal. Rptr. 520 (1970).

///

i.  State Court Decision

The California Court of Appeal rejected the claim as follows:

> [Petitioner] contends under separate headings that:  (1) defense counsel was ineffective for failing to move for judgment of acquittal on count IV -- attempting to dissuade a victim -- at the close of the prosecution's case (§ 1118.1);[4] and (2) there was insufficient evidence to support his conviction for that count.  We shall dispose of the two contentions together since the standard of review for a motion for judgment of acquittal is similar to the standard of review for the claim that the evidence is insufficient to support the judgment.  (*People v. Mendoza* (2000) 24 Cal.4th 130, 175.)  In doing so, we conclude that at the close of the prosecution's case, substantial evidence supported [Petitioner's] conviction for attempting to dissuade a victim; thus, defense counsel was not ineffective in failing to move for judgment of acquittal on that count. . . .
>
> To prevail on his claim that defense counsel was ineffective in failing to move for judgment of acquittal, [Petitioner] must demonstrate the motion would have been meritorious.  (*People v. Mattson* (1990) 50 Cal.3d 826, 876; *People v. Scott* (1997) 15 Cal.4th 1188, 1211.)  "'The standard applied by a trial court in ruling upon a motion for judgment of acquittal pursuant to section 1118.1 is the same as the standard applied by an appellate court in reviewing the sufficiency of the evidence to support a conviction, that is, "whether from the evidence, including all reasonable inferences to be drawn therefrom, there is any substantial evidence of the existence of each element of the offense charged."'  [Citation.]  'The purpose of a motion under section 1118.1 is to weed out as soon as possible those few instances in which the prosecution fails to make even a prima facie case.'  [Citations.]  The question 'is simply whether the prosecution has presented sufficient evidence to present the matter to the jury for its determination.'  [Citation.]  The sufficiency of the evidence is tested at the point the motion is made.  [Citations.]  The question is one of law, subject to independent review."  (*People v. Stevens* (2007) 41 Cal.4th 182, 200.)
>
> Section 136.1, subdivision (a)(2) prohibits anyone from "[k]nowingly and maliciously attempt[ing] to prevent or dissuade

---

[4] Section 1118.1 provides:  "In a case tried before a jury, the court on motion of the defendant or on its own motion, at the close of the evidence on either side and before the case is submitted to the jury for decision, shall order the entry of a judgment of acquittal of one or more of the offenses charged in the accusatory pleading if the evidence then before the court is insufficient to sustain a conviction of such offense or offenses on appeal.  If such a motion for judgment of acquittal at the close of the evidence offered by the prosecution is not granted, the defendant may offer evidence without first having reserved that right."

any . . . victim from attending or giving testimony at any trial, proceeding, or inquiry authorized by law." While mere preparation is not enough (see *People v. Sales* (2004) 116 Cal.App.4th 741, 748), "[w]here a defendant has [the intent to affect or influence a potential witness's or victim's testimony or acts] and 'performs an act that "go[es] beyond mere preparation . . . and . . . show[s] that the perpetrator is putting his or her plan into action" . . . , the defendant may be convicted of criminal attempt.' (*People v. Toledo* (2001) 26 Cal.4th 221, 230.)" (*People v. Foster* (2007) 155 Cal.App.4th 331, 335.)

[Petitioner] argues that "[a]ll the prosecution proved in this case was preparation. . . . [¶]   Direct movement toward the commission of the crime was not established.   In fact[,] Deputy Heath testified that he did not know how the document came to be in Pod B. . . . Assuming that it was thrown or dropped there from someone in Pod A, it was not shown that the action was done by [Petitioner] or at his behest. . . . As such, the inference that he followed through on his original plan was speculative, depending on surmise."  We are not persuaded.

There was ample evidence in the prosecution's case-in-chief from which the jury reasonably could infer the note was thrown or dropped by [Petitioner] or at his behest.  [Petitioner] clearly authored the note.  The note referenced one of the victims by her first name (Kim), gave the street she lived on (Almond), and was signed with [Petitioner's] nickname (Genester).  At the time the note was recovered, [Petitioner] was housed in the A pod.  The note requested a favor from someone housed in the adjoining B pod and was recovered in an area of the B pod that is next to the A pod.  That the note or its message did not reach the intended recipient(s) or Smith is of no consequence.  Because there was sufficient evidence to support a conviction for attempting to dissuade a victim, a section 1118.1 motion would have been fruitless at the close of the prosecution's case-in-chief.[5] Consequently, [Petitioner] was not deprived of his constitutional right to effective assistance of counsel.  (See *People v. Mattson*, *supra*, 50 Cal.3d at p. 876; *People v. Scott*, *supra*, 15 Cal.4th at p. 1211.)

Lodged Doc. 7, at 18-22 (missing page 22); *see People v. Hall*, No. C050642, 2008 WL 2811753, at *7-8 (Cal. Ct. App. July 22, 2008).

*///*

---

[5] The evidence against [Petitioner] only increased following the prosecution's case-in-chief.  Significantly, [Petitioner] admitted writing the note and said he did so because he wanted his friends to persuade Smith to tell the truth.

1        ii.  Analysis of Failure to Move for Acquittal Claim

2    The California Court of Appeal reasonably found that there was sufficient evidence "in

3 the prosecution's case-in-chief from which the jury reasonably could infer the note was thrown or

4 dropped by [Petitioner] or at his behest."  Lodged Doc. 7, at 21.  An attorney's failure to make a

5 meritless objection or motion does not constitute ineffective assistance of counsel.  *Jones v.*

6 *Smith*, 231 F.3d 1227, 1239 n.8 (9th Cir. 2000) (citing *Boag v. Raines*, 769 F.2d 1341, 1344 (9th

7 Cir. 1985)); *see also Rhoades v. Henry*, 596 F.3d 1170, 1179 (9th Cir. 2010) (holding counsel

8 did not render ineffective assistance in failing to investigate or raise argument on appeal where

9 "neither would have gone anywhere"); *Matylinsky v. Budge*, 577 F.3d 1083, 1094 (9th Cir. 2009)

10 (concluding counsel's failure to object to testimony on hearsay grounds not ineffective where

11 objection would have been properly overruled); *Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir.

12 1996) ("[T]he failure to take a futile action can never be deficient performance . . . .").

13    The record shows there was substantial evidence for the jury to infer reasonably that

14 Petitioner attempted to dissuade Smith from testifying.  Deputy Christopher Mark Heath

15 explained the layout of the jail:  the "first floor of the jail is composed of three housing units, A

16 pod, B pod, C pod."  Lodged Doc. 3, Rep.'s Tr. vol. 1, 163.  There is a doorway between the A

17 pod and the B pod.  *Id.* at 164.  It is "against jail policy" for "the people in A, B and C . . . to

18 communicate with one another."  *Id.*

19    On July 3, 2004, Deputy Heath was located in the control room, and Petitioner was

20 housed in cell A1 in the A pod.  *Id.*  Charles Allison, Sean Couch, and Daryn Carter were housed

21 in the B pod.  *Id.* at 168, 172-73.  Deputy Heath had a camera facing the door between the A and

22 B pod, and he could "see underneath both staircases" of the A and B pods, "upstairs," and "both

23 sides of the door."  *Id.* at 166-67.  Deputy Heath testified:

24     [G]enerally, there's no reason for inmates to go under these stairs.
     As soon as I see a[n] inmate approach underneath the stairs I

25     immediately turn around and face them and I watched inmate Brent
     Lay pick up that note beside that door.

26

1    *Id.* at 169.  Deputy Heath confirmed Inmate Lay was in the B pod when the note "was picked up

2    right next to the door."  *Id.* at 170.  Although Deputy Heath testified at first that he saw the note

3    thrown from the A pod to the B pod, *id.* at 165, he later clarified he did not see anyone pass the

4    note underneath the stairs.  *Id.* at 169, 176.  After Deputy Heath saw Inmate Lay with the note,

5    Deputy Heath signaled Inmate Lay to bring him the note, and Inmate Lay handed him the note.

6    *Id.* at 169-70.

7         The name, "Chuck Allison," appeared on the outside of "both sides" of the note.  *Id.* at

8    168.  The top line of the note "give[s] the first name" to whom the note was addressed, i.e.,

9    "Daryn."  *Id.* at 172.  The State read and described the note to the jury:

10                  Daryn, my respects to you over there.  Listen bro, I know your
                 cousin or nephew Sean Couch is over there and is getting out real
11                  soon.  He knows my alleged victim Kim lives on Almond.  Tell
                 him to handle that shit and tell him not to -- and tell her not to
12                  come to court anymore.  Shit bro, she's the only one coming.  And
                 if she don't come, I walk.  See what I'm talking about?  I send
13                  mine to you, Chuckie, and anyone else who has it coming.
                 Lightning bolts.  St[o]mp of the boot and right arm salute.
14                  Lightning bolts.  Get back at me on paper and let me know, with a
                 slash, Genester with a swastika under it.
15

16    *Id.* at 178-79.

17         Kimberly Smith, i.e., Kim, was the name of the victim for counts one and two (assault).

18    *See id.* at 65-66; *see also* Lodged Doc. 1, Clerk's Tr. 86-92.  Smith testified she lived on

19    "Almond Avenue."  Lodged Doc. 3, Rep.'s Tr. vol. 1, 65.  Petitioner has "Genester" tattooed on

20    his back, *id.* at 170-71, and "two lightning bolts between Yuba and the navel" tattooed "[r]ight

21    above his stomach."  *Id.* at 179.  "Genester" is Petitioner's street name or nickname.  *Id.* at 185.

22         In sum, the state appellate court properly noted that a motion for acquittal under section

23    1118.1 of the California Penal Code should be granted where the State failed to introduce

24    "substantial evidence," that is, "sufficient evidence to present the matter to the jury for its

25    determination."  *People v. Stevens*, 41 Cal. 4th 182, 200, 59 Cal. Rptr. 3d 196, 158 P.3d 763

26    (2007).  Here, the California Court of Appeal reasonably determined the prosecution presented

21

1   substantial evidence during its case in chief that Petitioner attempted to dissuade a witness.  *Cf.*

2   *People v. Foster*, 155 Cal. App. 4th 331, 336, 65 Cal. Rptr. 3d 869 (2007) (holding sufficient

3   evidence supported defendant's conviction of attempting to dissuade witness where defendant

4   "solicit[ed] a third party to convey his wishes to the victim").  The state appellate court reasoned

5   there was no reasonable likelihood that the trial judge would have granted a motion to acquit.

6   The state appellate court's determination is not contrary to, or an unreasonable application of

7   *Strickland*, nor is it based on an unreasonable determination of the facts in light of the evidence.

8       C.  Ground Two:  Prosecutorial Misconduct

9       In ground two, Petitioner argues his conviction was tainted by three of the prosecution's

10  remarks during closing argument, (1) "asking the jury to draw improper inferences from

11  [Petitioner's] exercise of [his] right[] to remain silent while charges were pending;" (2) "asking

12  [the jury to draw] . . . improper inferences of criminal dispositions" from "Nazi artwork in a

13  letter;" and (3) "misstating the reasonable doubt standard."  Pet'r's Am. Pet. 4 (citation and

14  internal quotation marks omitted).

15      1.  Legal Standard for Prosecutorial Misconduct

16      Where a federal habeas petitioner asserts prosecutorial misconduct involving allegedly

17  improper argument, "[t]he relevant question is whether the prosecutor's comments 'so infected

18  the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Darden v.*

19  *Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643

20  (1974)); *Tan v. Runnels*, 413 F.3d 1101, 1112 (9th Cir. 2005) ("[U]nder *Darden*, the first issue is

21  whether the prosecutor's remarks were improper and, if so, whether they infected the trial with

22  unfairness."); *Duckett v. Godinez*, 67 F.3d 734, 743 (9th Cir. 1995) ("On a petition for a writ of

23  habeas corpus, the standard of review for a claim of prosecutorial misconduct . . . is 'the narrow

24  one of due process, and not the broad exercise of supervisory power.'").

25      The law is well settled that, under this due process standard, "[c]ounsel are given latitude

26  in the presentation of their closing arguments, and courts must allow the prosecution to strike

1 hard blows based on the evidence presented and all reasonable inferences therefrom." *Ceja v.*
2 *Stewart*, 97 F.3d 1246, 1253-54 (9th Cir. 1996) (internal quotation marks omitted).  A reviewing
3 court should consider a prosecutor's allegedly improper statements in light of the realistic nature
4 of trial closing arguments.  "Because 'improvisation frequently results in syntax left imperfect
5 and meaning less than crystal clear,' 'a court should not lightly infer that a prosecutor intends an
6 ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy
7 exhortation, will draw that meaning from the plethora of less damaging interpretations.'"
8 *Williams v. Borg*, 139 F.3d 737, 744 (9th Cir. 1998) (quoting *Donnelly*, 416 U.S. at 647).  A
9 challenged or offending statement must also be evaluated in the context of the entire trial, as well
10 as the context in which it was made.  *Boyde v. California*, 494 U.S. 370, 384-85 (1990)
11 (determining prosecutor's arguments must be judged in context in which they were made,
12 bearing in mind counsel's arguments carry less weight than instructions from court); *Donnelly*,
13 477 U.S. at 643 (holding due process claim based on prosecutorial argument is decided based on
14 "examination of the entire proceedings"); *Allen v. Woodford*, 395 F.3d 979, 997-98 (9th Cir.
15 2005) (finding that, although some of prosecutor's comments in closing argument were
16 improper, "none of them, considered separately or cumulatively" prejudiced petitioner); *see also*
17 *United States v. Young*, 470 U.S. 1, 11-12 (1985) (even on direct review in federal criminal case,
18 improper closing argument "must be examined within the context of the trial to determine
19 whether the prosecutor's behavior amounted to prejudicial error").
20      The first factor in determining the prejudicial effects of misconduct is whether the trial
21 court issued a curative instruction.  When a curative instruction is issued, a court presumes that
22 the jury has disregarded inadmissible evidence and that no due process violation occurred.  *See*
23 *Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987).  This presumption may be overcome if there is an
24 "overwhelming probability" that the jury would be unable to disregard evidence and a strong
25 likelihood that the effect of the misconduct would be "devastating" to the defendant.  *See id.*
26      Other factors which a court may take into account in determining whether misconduct

1    rises to a level of due process violation are:  (1) the weight of evidence of guilt, *compare United*

2    *States v. Young*, 470 U.S. 1, 19 (1985) (finding "overwhelming" evidence of guilt), *with United*

3    *States v. Schuler*, 813 F.2d 978, 982 (9th Cir. 1987) (requiring new trial after prosecutor referred

4    to defendant's courtroom demeanor, in light of prior hung jury and lack of curative instruction);

5    (2) whether the misconduct was isolated or part of an ongoing pattern, *see Lincoln v. Sunn*, 807

6    F.2d 805, 809 (9th Cir. 1987); (3) whether the misconduct relates to a critical part of the case, *see*

7    *Giglio v. United States*, 405 U.S. 150, 154 (1972) (requiring new trial where prosecutor failed to

8    disclose information showing witness's potential bias, because government's case rested on that

9    witness's credibility); and (4) whether a prosecutor's comment misstates or manipulates the

10   evidence.  *See Darden*, 477 U.S. at 182.

11                          2.  Petitioner's Post-Arrest Silence

12        Petitioner alleges that the prosecutor committed misconduct in violation of *Doyle v. Ohio*,

13   426 U.S. 610 (1976) (holding prosecutor cannot seek to impeach testifying defendant's

14   exculpatory testimony with defendant's post-arrest silence following issuance of *Miranda*

15   warnings).  Petitioner argues that the prosecutor's comment on his post-arrest silence, made

16   during closing argument, was used for the impermissible purpose of suggesting that he fabricated

17   his story implicating who attacked Smith.

18                          a.  State Court Decision

19        The California Court of Appeal rejected Petitioner's *Doyle* claim as follows, in relevant

20   part:

21              During his rebuttal, the prosecutor noted that [Petitioner] initially
                identified "Anthony Edwards and Kenny" as Smith's assailants and
22              that he failed to identify Marcus Crans as one of Smith's assailants
                until trial.  Referring to [Petitioner's] failure to initially name
23              Crans, the prosecutor then stated:  "So the unanswered question is
                why sit in jail for two years before you tell us who did it?"
24              Defense counsel objected to the statement as "[i]mproper
                argument," and the trial court sustained the objection.  On appeal,
25              [Petitioner] claims the prosecutor violated the holding of *Doyle v.*
                *Ohio* (1976) 426 U.S. 610 [49 L.Ed.2d 91] and committed
26              prejudicial misconduct by commenting on "[Petitioner's] exercise

                                           24

of his rights." We disagree.

The prosecution violates the defendant's due process rights if it uses evidence of a defendant's post-*Miranda*[6] silence for impeachment purposes at trial.  (*Doyle v. Ohio*, *supra*, 426 U.S. at pp. 618-619 [49 L.Ed.2d at p. 98]; see also *Greer v. Miller* (1987) 483 U.S. 756, 763 [97 L.Ed.2d 618, 628].)  However, *Doyle* is inapplicable where a defendant presents exculpatory testimony at trial that is inconsistent with his statements given post-*Miranda*.  (*Anderson v. Charles* (1980) 447 U.S. 404 [65 L.Ed.2d 222].)

In *Anderson*, the defendant was arrested for driving a stolen car that belonged to a murder victim.  (*Anderson v. Charles*, *supra*, 447 U.S. at p. 404 [65 L.Ed.2d at p. 222].)  At the time of his arrest and post-*Miranda*, he said he took the car from a street location.  (*Id.* at p. 405 [65 L.Ed.2d at p. 224].)  At trial, however, he testified he stole the car from a parking lot near the county jail.  (*Ibid.*)  The prosecutor cross-examined the defendant on his ability to fabricate the location where he obtained the car by questioning him about his ability to see a parking lot from the county jail.  (*Ibid.*)  The prosecutor then asked the defendant, "'Don't you think it's rather odd that if it were the truth that you didn't come forward and tell anybody at the time you were arrested, where you got the car?'"  (*Id.* at p. 406 [65 L.Ed.2d at p. 225].)  In determining *Doyle* was inapplicable to the facts of the case, the court explained:  "The quoted colloquy, taken as a whole, does 'not refe[r] to the [defendant's] exercise of his right to remain silent; rather [it asks] the [defendant] why, if [his trial testimony] were true, he didn't tell the officer that he stole the decedent's car from the tire store parking lot instead of telling him that he took it from the street.'  [Citation.]  Any ambiguity in the prosecutor's initial questioning was quickly resolved by explicit reference to [the officer]'s testimony, which the jury had heard only a few hours before.  The questions were not designed to draw meaning from silence, but to elicit an explanation for a prior inconsistent statement."  (*Anderson*, at pp. 408-409 [65 L.Ed.2d at p. 227].)

The same is true here.  The prosecutor did not refer to [Petitioner's] exercise of his right to remain silent; he simply asked why, if [Petitioner's] trial testimony were true, he did not identify Marcus Crans as one of Smith's assailants when he was interviewed immediately after the incident.  The statement was not designed to draw meaning from silence, but to highlight for the jury [Petitioner's] inconsistent statements.  Accordingly, *Doyle* does not apply to the facts of this case.  (*Anderson v. Charles*, *supra*, 447 U.S. at p. 409 [65 L.Ed.2d at p. 227].)

---

[6] *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694].

25

1   Lodged Doc. 7, at 11-13.

2               b.  Analysis of Petitioner's Post-Arrest Silence Claim

3           Here, during closing arguments, the prosecutor argued Petitioner gave prior inconsistent

4   statements.  Lodged Doc. 3, Rep.'s Tr. vol. 2, 366-67.  The prosecutor mentioned Petitioner

5   initially stated he did not see who attacked Smith; Petitioner then told the police "Anthony

6   Edwards and Kenny" attacked Smith, but "two years later [was] the very first time ever Marcus

7   Crans is named as a suspect."  *Id.* at 367; *see also* Lodged Doc. 3, Rep.'s Tr. vol. 1, 272, 281-82.

8   The prosecutor asked the rhetorical question, "So the unanswered question is why sit in jail for

9   two years before you tell us who did it."  Lodged Doc. 3, Rep.'s Tr. vol. 2, 367.  The trial court

10  sustained defense counsel's objection.  *Id.*

11          No further argument regarding Petitioner's silence occurred, and earlier, the trial court

12  specifically advised the jury, *inter alia*:

13                  Statements made by the attorneys during the trial are not evidence.
                    . . .
14
                    If an objection was sustained to a question, do not guess what the
15                  answer might have been.  Do not speculate as to the reason for the
                    objection.  Do not assume to be true any insinuation suggested by a
16                  question asked a witness.  A question is not evidence and it may be
                    considered only as it helps you to understand the answer.  Do not
17                  consider for any purpose any offer of evidence that was rejected or
                    any evidence that was stricken by myself.  Treat it as though you
18                  had never heard of it.

19  Lodged Doc. 3, Rep.'s Tr. vol. 2, 336-37.  Since the trial court explicitly sustained an objection

20  to the prosecutor's rhetorical question, "[t]he fact of [Petitioner's] postarrest silence was not

21  submitted to the jury . . . from which it was allowed to draw any permissible inference, and thus

22  no *Doyle* violation occurred in this case."  *See Miller*, 483 U.S. at 764-65.  The state appellate

23  court's ruling did not result in a decision that was contrary to, or involved an unreasonable

24  application of, clearly established federal law.

25              3.  Jailhouse Note

26          Petitioner asserts that the prosecutor committed misconduct by referring to the Nazi

                                                  26

phrases on the jailhouse note (stomp of the boot and right arm salute).  Pet'r's Am. Pet. 4.

Petitioner contends these comments were an attempt to have the jury draw improper inferences of

"criminal disposition[]."  *Id.*

                         a.  State Court Decision

      The California Court of Appeal rejected Petitioner's claim as follows, in relevant part:

> At a pretrial hearing, the trial court stated that under Evidence Code section 352 it was "disinclined" to permit gang expert testimony regarding the jailhouse note.
>
> During his closing argument, defense counsel said:  "Let's talk about this [jailhouse] note. . . . This is not a racial issue here.  Lady is white. . . . But [the] prosecution . . . wants to put the spin on it that it is.  Why do they want to do that?  They want you to be prejudiced against [Petitioner].  Exactly what you are told not to do.  But they want to get that in. . . . This guy has a swastika.  And this and that.  You're the judge.  You have to put all those things behind you.  Why?  What does it have to do with the case?  Nothing.  They're trying to taint his image in front of you."
>
> In rebuttal, the prosecutor responded:  "Now, prejudice.  Stomp of the boot, one arm salute.  Does that go to prejudice or does it go to an identification with an organization concerned with violence?"  Defense counsel objected as "improper" and stated "[n]o evidence of that."  The trial court sustained the objection and instructed the jury to "disregard the last comment."  The prosecutor then referred to what he characterized as [Petitioner's] "direct testimony" concerning the common meaning of a swastika and "it's [sic] identification with what we all know about Nazi Germany."  [Petitioner] objected to this statement as "totally improper" and challenged the prosecutor's use of the term "direct testimony."  The trial court responded, "[i]t's not rebuttal on anything" and directed the prosecutor to "move along."
>
> On appeal, [Petitioner] complains the prosecutor's comments during rebuttal were an attempt to get the jury to draw an improper inference of a criminal or a violent disposition.  He also argues the comments were inflammatory and violated the spirit of the court's in limine ruling that it was disinclined to allow gang expert testimony on the meaning of the terms in the jailhouse note.  The People counter that the prosecutor was merely responding to defense counsel's argument that the prosecution was trying to prejudice the jury against [Petitioner], and in any event, any error was harmless.
>
> "'As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion--and on the

same ground--the defendant [requested] an assignment of misconduct and [also] requested that the jury be admonished to disregard the impropriety.'" (*People v. Ochoa* (1998) 19 Cal.4th 353, 427.)  While [Petitioner] objected to the prosecutor's remark concerning the swastika as "totally improper," he did not request the jury be admonished to disregard it.[7]  He thus forfeited the argument here.  As we shall explain, [Petitioner] forfeited his challenge as to one of the statements, and in any event, any misconduct on the part of the prosecutor was harmless.

In any event, [Petitioner's] claim fails on the merits.  The remarks were brief and comprised only a small portion of the prosecution's argument.  The jury was instructed to disregard the prosecutor's remark, "Does that go to prejudice or does it go to an identification with an organization concerned with violence?"[8]  It was also instructed that it must decide the case on the facts and the law and not based on prejudice.  (CALJIC No. 1.00.)  We presume the jury followed these instructions.  (*People v. Morales* (2001) 25 Cal.4th 34, 47.)  Moreover, the prosecutor's remark concerning the swastika accurately summarized [Petitioner's] testimony on cross-examination wherein he agreed a swastika commonly means "World War II Nazi Germany," and [Petitioner] does not challenge the admission of that evidence here.  Thus, assuming without deciding [whether] the remarks constituted misconduct, we find they did not so infect the trial with unfairness as to make the resulting conviction a denial of due process, and it is unlikely the jury would have reached a verdict more favorable to [Petitioner] had the remarks not been made.  (See *People v. Rundle*, *supra*, 43 Cal.4th at p. 157.)

Lodged Doc. 7, at 13-16.

### b.  Procedural Bar:  Contemporaneous Objection Rule

Respondent contends that "Petitioner has procedurally defaulted his claim concerning the 'swastika' comment."  Resp't's Answer 25.  Respondent points out the "state appellate court's finding of forfeiture rested on state-law grounds (failure to request an admonition)."  *Id.* Respondent also argues "[w]ith respect to the merits, it is clear that the prosecutor's remarks did

---

[7] Although [Petitioner] did not request the court admonish the jury to disregard the prosecutor's comment concerning prejudice and identification with an organization concerned with violence, we find the issue was preserved for review because the court nevertheless admonished the jury to disregard it.

[8] We note the phrase "organization concerned with violence" is ambiguous.  For purposes of our analysis, we presume, as [Petitioner] appears to contend, that the phrase reasonably could be construed to mean an organization that perpetrates acts or supports the use of violence.

1    not so infect the trial with unfairness as to deny due process." *Id.*

2                    i.  Legal Standard for Contemporaneous Objection Rule

3          Procedural default is an affirmative defense. *Bennett v. Mueller*, 322 F.3d 573, 585 (9th

4    Cir. 2003).  In order to bar federal habeas corpus review of a petitioner's claims, the procedural

5    rule cited by the California Supreme Court must be adequate and independent to support the

6    judgment. *See Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991); *Fields v. Calderon*, 125

7    F.3d 757, 760 (9th Cir. 1997).  "A state ground is independent and adequate only if the last state

8    court to which the petitioner presented the claim 'actually relied' on a state rule that was

9    sufficient to justify the decision." *Carter v. Giurbino*, 385 F.3d 1194, 1197 (9th Cir. 2004)

10   (citing *Valerio v. Crawford*, 306 F.3d 742, 773 (9th Cir. 2002) (en banc)).  The burden of

11   proving a state procedural ground is independent and adequate is upon the state of California.

12   *Bennett*, 322 F.3d at 582-85.

13         "Under Section 353 of the California Evidence Code, also known as the

14   'contemporaneous objection rule,' evidence is admissible unless there is an objection, the

15   grounds for the objection are clearly expressed, and the objection is made at the time the

16   evidence is introduced." *Melendez v. Pliler*, 288 F.3d 1120, 1125 (9th Cir. 2002).  Under

17   California's "contemporaneous objection rule," California courts construe broadly the sufficiency

18   of objections that preserve issues for appellate review, focusing on whether the trial court had a

19   reasonable opportunity to rule on the merits of the objection. *Id.*  The Ninth Circuit held "that

20   the rule is consistently applied when a party has failed to make *any* objection . . . ." *Id.* (citing

21   *Garrison v. McCarthy*, 653 F.2d 374, 377 (9th Cir. 1981)).

22         "If it is unclear whether the state court dismissed the petition because of a state law

23   procedural default or on the merits of the petitioner's federal constitutional claims, a federal court

24   may review the merits of the claims presented." *Loveland v. Hatcher*, 231 F.3d 640, 643 (9th

25   Cir. 2000) (citing *Siripongs v. Calderon*, 35 F.3d 1308, 1317 (9th Cir. 1994)).  Recently, the

26   Ninth Circuit stated that "where . . . the state court did not 'clearly and expressly' rely *solely*

1 *upon* procedural default in rejecting a petitioner's claim, this court may address the merits of that

2 claim." *Belmontes v. Ayers*, 529 F.3d 834, 856 (9th Cir. 2008) (emphasis added).

3                                    ii.   Analysis of Contemporaneous Objection Rule

4          Here, it is unclear whether the state appellate court denied the direct appeal because of a

5 state law procedural default or on the merits of Petitioner's federal constitutional claims.  *See*

6 *Loveland*, 231 F.3d at 643.  The California Court of Appeal noted that for Petitioner to appeal on

7 prosecutorial misconduct grounds, he had to request "'an assignment of misconduct and [also]

8 request[] that the jury be admonished to disregard the impropriety.'"  Lodged Doc. 7, at 15

9 (citing *People v. Ochoa*, 19 Cal. 4th 353, 427, 79 Cal. Rptr. 2d 408, 966 P.2d 442 (1998)).  The

10 California Court of Appeal recognized that Petitioner "objected to the prosecutor's remarks

11 concerning the swastika as 'totally improper,'" but failed to request that the jury disregard it.  *Id.*

12 The California Court of Appeal reasoned that Petitioner "forfeited the argument here," but "[i]n

13 any event, [Petitioner's] claims fails on the merits."  *Id.*

14          Additionally, the California Supreme Court denied Petitioner's original state habeas

15 petition without comment or citation, *see* Lodged Doc. 9, which is construed as a decision on the

16 merits.  *Hunter v. Aispuro*, 982 F.2d 344, 348 (9th Cir. 1992).  This decision effectually removes

17 the procedural default applied in part by the California Court of Appeal when denying

18 Petitioner's direct appeal.  *Ylst*, 501 U.S. at 801 ("State procedural bars . . . may expire because

19 of later actions by state courts.  If the last state court to be presented with a particular federal

20 claim reaches the merits, it removes any bar to federal-court review that might otherwise have

21 been available.").  The merits of Petitioner's prosecutorial misconduct claim regarding the

22 jailhouse note must be addressed.

23                                    c.   Merits of the Jailhouse Note Claim

24          Here, the prosecutor's remarks regarding the jailhouse note did not "so infect[] the trial

25 with unfairness as to make the resulting conviction a denial of due process."  *Darden*, 477 U.S. at

26 181 (citation and internal quotation marks omitted).  During closing arguments, the trial court

instructed the jury to disregard the prosecutor's references to the "[s]tomp of the boot, one arm

salute:"

> [THE STATE:]  Now, prejudice.  Stomp of the boot, one arm
> salute.  Does that go to prejudice or does it go to an identification
> with an organization concerned with violence?

> [DEFENSE COUNSEL:]  Objection, Your Honor.  That's
> improper.  No evidence of that.

> THE COURT:  Okay.  The objection is sustained.  The jury will
> disregard the last comment.

Lodged Doc. 3, Rep.'s Tr. vol. 2, 367.  And, as stated earlier, the trial court instructed the jury,

*inter alia*, that "[s]tatements made by the attorneys during the trial are not evidence," and the jury

cannot "consider for any purpose any offer of evidence that was rejected or any evidence that was

stricken by [the trial court]."  *Id.* at 336.

Reviewing courts presume "that jurors, conscious of the gravity of their task, attend

closely the particular language of the trial court's instructions in a criminal case and strive to

understand, make sense of, and follow the instructions given them."  *Francis v. Franklin*, 471

U.S. 307, 324 n.9 (1985); *see also Miller*, 483 U.S. at 767 n.8; *Richardson v. Marsh*, 481 U.S.

200, 206 (1987) (referring to "the almost invariable assumption of the law that jurors follow their

instructions").  If this presumption is not accepted, virtually any verdict would be open to

question because it can always be argued that the jury was a rogue one and disobeyed the

instructions, or simply made up law to augment the instructions given.  The jurors at Petitioner's

trial presumably followed all (and only) the instructions given.  Doing so would not permit the

jury to convict Petitioner based on the prosecutor's statement, "Stomp of the boot, one arm

salute," as the trial court instructed the jury to disregard that statement.  Lodged Doc. 3, Rep.'s

Tr. vol. 2, 367.

The prosecutor's comments also could not have "infected the entire trial that the resulting

conviction violates due process" because of Petitioner's own testimony.  *See McGuire*, 502 U.S.

at 72.  On cross examination, Petitioner admitted that the swastika's common meaning involves

31

"World War II Nazi Germany:"

> [PETITIONER:]  It doesn't say stamp of a boot.  It says "stomp of a boot and right arm salute."

> [THE STATE:]  I apologize.  What does that mean?

> [PETITIONER:]  White saying when you sign of[f] [y]our letters to another white man.

> . . . .

> [THE STATE:]  Okay.

> And the swastika at the bottom, does that have a unique meaning or common meaning?

> [DEFENSE COUNSEL:]  I object to that.  I mean, this is -- there's not a race issue here.

> THE COURT:  Okay.  Objection overruled.

> [PETITIONER:]  What was the question?

> [THE STATE:]  The swastika have a unique meaning in prison or common meaning?

> [PETITIONER:]  I don't know what the common meaning is.

> [THE STATE:]  World War II Nazi Germany?

> [PETITIONER:]  Yes, sir.

> [THE STATE:]  That's the same meaning you use it for in prison?

> [PETITIONER:]  Yes, sir.

Lodged Doc. 3, Rep.'s Tr. vols. 1-2, 299-300.  Since the prosecutor's comments on the jailhouse note did not infect the trial with unfairness, habeas relief on this claim should be denied.

### 4.  Reasonable Doubt Standard

Petitioner contends that the prosecutor committed misconduct in misstating the reasonable doubt standard during closing argument.  Pet'r's Am. Pet. 4.

### a.  State Court Decision

The California Court of Appeal rejected the claim as follows:

Finally, when discussing the meaning of reasonable doubt, the prosecutor said: "[T]his is not I think he did it.  It's I know.  When you know something, you're beyond a reasonable doubt when you know it. . . . [I] suggest, ladies and gentlemen, that if you know he did it then I met my burden."  [Petitioner] objected as an "[i]mproper statement of the law" regarding reasonable doubt, and the trial court sustained the objection.  On appeal, [Petitioner] again complains the prosecutor misstated the law concerning reasonable doubt. [Petitioner] forfeited this challenge by failing to request a jury admonition. (See *People v. Ochoa*, *supra*, 19 Cal.4th at p. 427.)  In any event, any misconduct by the prosecutor was harmless.

The jury was properly instructed on the meaning of reasonable doubt as follows:  "Reasonable doubt is . . . not a mere possible doubt because everything relating to human affairs is open to some possible or imaginary doubt.  It is that state of the case which after the entire comparison and consideration of all of the evidence leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction of truth of the charge."  (CALJIC No. 2.90.)  The prosecutor's statement that when you "know," as opposed to "think," something is true, "you're beyond a reasonable doubt" is not wholly inconsistent with that definition.  When considered in context, it is clear the prosecutor was equating "know[ing]" with a high level of certainty, consistent with CALJIC No. 2.90.  To the extent there was any confusion, the jury was further instructed to follow the law as given by the court and ignore contradictory statements by the attorneys.  We presume "'the jury treated the court's instructions as statements of law, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade.' [Citation.]" (*People v. Morales*, *supra*, 25 Cal.4th at p. 47.)  Thus, even if the prosecutor misstated the law concerning reasonable doubt, [Petitioner] suffered no prejudice as a result.

Lodged Doc. 7, at 16-18.

### b.  Procedural Bar:  Contemporaneous Objection Rule

Like the jailhouse note claim, Respondent argues "Petitioner forfeited this challenge by failing to request a jury admonition."  Resp't's Answer 27.  According to Respondent, "Petitioner has procedurally defaulted his claim concerning the comment on reasonable doubt."  *Id.* Respondent also contends that the claim fails on the merits because "the prosecutor did not err," and "any misstatement by the prosecutor was harmless in light of the trial court's instructions to the jury."  *Id.*

33

1    As with the jailhouse note claim, it is unclear whether the state appellate court denied the

2    reasonable doubt claim based on procedural default or on the merits, as the state appellate court

3    addressed both grounds.  *See Loveland*, 231 F.3d at 643.  The state appellate court stated that

4    Petitioner "forfeited this challenge by failing to request a jury admonition," and "[i]n any event,

5    any misconduct by the prosecutor was harmless."  Lodged Doc. 3, at 17.  The California

6    Supreme Court denied Petitioner's original state habeas petition without comment or citation.

7    *See* Lodged Doc. 9.  This is construed as a decision on the merits, *Hunter*, 982 F.2d at 348, which

8    removes the procedural default applied in part by the California Court of Appeal when denying

9    Petitioner's direct appeal.  *Ylst*, 501 U.S. at 801.  The merits of Petitioner's prosecutorial

10   misconduct claim regarding the reasonable doubt standard must be addressed.

11                    c.  Merits of the Reasonable Doubt Standard Claim

12        The challenged statements are:

13            [THE STATE:]  One other point and, again, this goes back to voir
              dire.  The issue is not I think he did it.  It's I know.  When you
14            know something you're beyond a reasonable doubt when you know
              it.  I agree again with [defense counsel].  I think he did it, that's not
15            beyond reasonable doubt.  If that's the best that you can do back
              there, ladies and gentlemen, if you're back there and [the] best you
16            can say, gee, I think he may have gone it, it may have happened
              that way, then you have to bring back a verdict of not guilty.  But I
17            suggest, ladies and gentlemen, that if you know he did it then I met
              my burden.

18

19   Lodged Doc. 3, Rep.'s Tr. vol. 2, 368.  Defense counsel objected:

20            [DEFENSE COUNSEL:]  I object.  Improper statement of the law.
              Not properly reflecting beyond reasonable doubt.
21
              THE COURT: Sustained.
22

23   *Id.*

24        Here, the prosecutor's closing argument was not prejudicial to the fairness of Petitioner's

25   trial.  The trial court properly instructed the jury as to reasonable doubt:

26            A defendant in a criminal action is presumed to be innocent until

                                         34

1
2
3
4
5
> the contrary is proved and in case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to a verdict of not guilty. This presumption places upon the People the burden of proving him guilty beyond a reasonable doubt. Reasonable doubt is defined as follows: It is not a mere possible doubt because everything relating to human affairs is open to some possible or imaginary doubt. It is that state of the case which after the entire comparison and consideration of all of the evidence leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction of the truth of the charge.

6

7 *Id.* at 319. The trial court also properly instructed the jury to follow the trial court's instructions

8 if there were any conflicts between the attorneys' arguments and the trial court's instructions. *Id.*

9 at 318. It is presumed the jury followed the trial court's instructions, and there is not an

10 "overwhelming probability" that the jury would be unable to follow the trial court's instructions.

11 *Miller*, 483 U.S. at 767 n.8 (citing *Marsh*, 481 U.S. at 208); *see Franklin*, 471 U.S. at 324 n.9.

12 Petitioner is not entitled to federal habeas relief, and this claim should be denied.

13       D. Ground Four: Unduly Suggestive Lineup

14       In ground four, Petitioner argues "[t]he impermissibly suggestive pre-trial identification

15 procedures and tainted in court identification of [Petitioner] violated" Petitioner's Fifth and

16 Fourteenth Amendment due process rights. Pet'r's Am. Pet. 5. Specifically, Petitioner argues

17 that the photographic lineup was impermissibly suggestive because "Petitioner is the only

18 Caucasian in the photo line up and is the only person without facial hair." *Id.*

19       1. State Court Decision

20 The California Court of Appeal rejected the claim as follows:

21
22
23
24
25
26
> [Petitioner] contends "the impermissibly suggestive pre-trial identification procedures and [T. A.'s] tainted in-court identification" of [Petitioner] violated his right to due process of law under the Fifth and Fourteenth Amendments to the federal Constitution. He argues the photographic lineup shown to T. A. was "unduly suggestive" and unreliable because [Petitioner] was "the only one who did not appear to be Hispanic" and "the only one who did not have facial hair," and thus, "evidence of [T. A.'s] pre-trial identification," as well as "the trial lineup" should have been excluded. He claims the inclusion of this evidence cannot be deemed harmless because T. A.'s "testimony was significant in

35

placing [Petitioner] at the scene and . . . in attributing a racial remark to him."

We need not decide whether the pretrial identification procedures were unduly suggestive and tainted T. A.'s in-court identification because, as we shall explain, any error in admitting evidence of T. A.'s pretrial identification or allowing the in-court identification was harmless beyond a reasonable doubt.  (See *People v. Carlos* (2006) 138 Cal.App.4th 907, 912.)

The key issue in this case was who assaulted Smith and Britt.  T. A. did not identify [Petitioner] as the person who assaulted either victim; he did not see who hit Smith and was not asked about Britt.  While he did testify he saw [Petitioner], along with others, at the scene, his testimony was not necessary to establish [Petitioner's] presence.  Numerous witnesses testified [Petitioner] was present, and [Petitioner] admitted he was there.

Similarly, while T. A. at least initially attributed a racial remark he heard on the night in question to [Petitioner], that [Petitioner] harbored racial animus toward nonwhites is clear from the jailhouse note he admitted writing and his testimony concerning the meaning of the phrases "St[o]mp of the boot and right arm salute" and "lightning bolts" and the swastika symbol contained therein.  Moreover, there is no indication in the record that Smith, Britt, or anyone present on the night in question was African-American.  On this record, we have no trouble concluding, beyond a reasonable doubt, that evidence [Petitioner] made the above-mentioned racial remark made no difference in the outcome of the case.

Lodged Doc. 7, at 6-7.

### 2.  Legal Standard for Unduly Suggestive Lineup Claim

The Due Process Clause of the United States Constitution prohibits the use of identification procedures which are "unnecessarily suggestive and conducive to irreparable mistaken identification."  *Stovall v. Denno*, 388 U.S. 293, 302 (1967), *overruled on other grounds by Griffith v. Kentucky*, 479 U.S. 314, 326 (1987) (discussing retroactivity of rules propounded by Supreme Court).  To determine the admissibility of identification testimony, courts employ a two-step analysis.  *United States v. Love*, 746 F.2d 477, 478 (9th Cir. 1984).

The first step focuses on whether the identification procedure was impermissibly suggestive.  *Id.* (citing *Manson v. Brathwaite*, 432 U.S. 98, 107 (1977); *Neil v. Biggers*, 409 U.S.

1   188, 199-200 (1972)).  A suggestive identification violates due process if it was unnecessary or

2   "gratuitous" under the circumstances.  *Biggers*, 409 U.S. at 198.  An identification procedure is

3   suggestive where it "[i]n effect . . . sa[ys] to the witness, 'This is the man.'"  *Foster v. California*,

4   394 U.S. 440, 443 (1969).  Each case must be considered on its own facts, and whether due

5   process was violated depends on the totality of the circumstances surrounding the confrontation.

6   *Simmons v. United States*, 390 U.S. 377, 383 (1968); *see also Stovall*, 388 U.S. at 302.  If the

7   court finds that a challenged procedure is not impermissibly suggestive, the due process inquiry

8   ends.  *United States v. Bagley*, 772 F.2d 482, 493 (9th Cir. 1985) ("Having concluded that the . . .

9   show-up was a legitimate identification procedure, we need not reach the question whether the

10   [witness's] identification was reliable under the test enunciated in *Biggers*."), *cert. denied*, 475

11   U.S. 1023 (1986).

12         If the identification procedure was impermissibly suggestive, a reviewing court proceeds

13   to the second step and determines whether, under the totality of the circumstances, an

14   identification that resulted from it was nevertheless reliable.  *Biggers*, 409 U.S. at 198.  Factors

15   to be considered in evaluating the reliability of an identification after a suggestive procedure

16   include:  (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the

17   witness's degree of attention paid to the criminal; (3) the accuracy of the witness's prior

18   description of the criminal; (4) the level of certainty demonstrated by the witness at the time of

19   the confrontation; and (5) the length of time between the crime and the confrontation.  *Id.* at

20   199-200; *Torres v. City of Los Angeles*, 548 F.3d 1197, 1209 (9th Cir. 2008), *cert. denied*, ___

21   U.S. ___, 129 S. Ct. 1995 (2009).

22         3.  Analysis of Unduly Suggestive Lineup Claim

23         First, Petitioner's argument that his lineup was unduly suggestive because he was "the

24   only Caucasian" in the photographic lineup, and he was "the only person without facial hair," is

25   unpersuasive.  Pet'r's Am. Pet. 5.  The prosecutor stated that all persons in the photographic

26   lineup were Caucasian.  Lodged Doc. 3, Rep's Tr. 84.  The trial court disagreed with defense

1  counsel's claim that all others in the lineup were "of different ethnicities" by stating, "I was

2  going to say that isn't necessarily true."  *Id.*

3      The Ninth Circuit has consistently declined to hold that minor differences between

4  suspects' photographs render a lineup impermissibly suggestive.  In *Mitchell v. Goldsmith*, 878

5  F.2d 319, 323 (9th Cir. 1989), the Ninth Circuit rejected a habeas petitioner's claim that pretrial

6  identification procedures were unduly suggestive where he was "the only person in the lineup

7  who was photographed against a blue background; four of the seven individuals in the

8  photographic lineup had lighter complexions than his; and [his] photo was the only photo with a

9  1981 date."  Likewise, in *United States v. Collins*, 559 F.2d 561, 563 (9th Cir. 1977), the court

10  rejected the same argument where the petitioner claimed that "(1) three of the six Negro male

11  individuals depicted appeared to be significantly younger than [the petitioner]; (2) only [the

12  petitioner] and two others appear to have afro-style haircuts; and (3) only [the petitioner] appears

13  to have a beard."  *See also United States v. Burdeau*, 168 F.3d 352, 357 (9th Cir. 1999) (finding

14  photo array not suggestive where defendant's picture "was placed in the center of the array, was

15  darker than the rest, and was the only one in which the eyes were closed," and citing cases for

16  proposition that "such insubstantial differences . . . do not in themselves create an impermissible

17  suggestion that the defendant is the offender"); *United States v. Johnson*, 820 F.2d 1065, 1073

18  (9th Cir. 1987) (holding photographic array not unduly suggestive where defendant's photograph

19  was hazier than others); *United States v. Sambrano*, 505 F.2d 284, 286 (9th Cir. 1974)

20  (determining photographic array not unduly suggestive where defendant's photograph was darker

21  and clearer than others); *United States v. Lincoln*, 494 F.2d 833, 839 (9th Cir. 1974) (finding

22  photographic array not unduly suggestive where defendant's color driver's license photograph

23  was shown with black and white copies of driver's licenses or other types of photos).

24      Since the challenged procedure was not impermissibly suggestive, the due process inquiry

25  ends.  *Bagley*, 772 F.2d at 493.  However, even under the second step of the due process inquiry,

26  the totality of the circumstances shows T. A.'s identification was reliable.  *Biggers*, 409 U.S. at

1   198.

2       T. A.'s identification of Petitioner was corroborated by other witnesses.  Deputy Bringolf

3   interviewed T. A.  Lodged Doc. 3, Rep.'s Tr. vol. 1, 154.  T. A. told Deputy Bringolf that the

4   person who yelled the racially offensive remark "was wearing a white tank with blue jeans and

5   had brown hair."  *Id.* at 155.  Deputy Bringolf also testified that T. A. said the individual "had

6   both arms covered in tattoos," and "[w]as a man," not a juvenile.  *Id.*

7       T. A.'s description of Petitioner was accurate, *see Biggers*, 409 U.S. at 199, as other

8   witnesses testified that Petitioner was wearing a white tank top and blue jeans.  *See* Lodged Doc.

9   3, Rep.'s Tr. 101-03, 106 (Kovach's testimony); *id.* at 197-99 (Sergeant Anderson's testimony

10  that Petitioner "was wearing a dark T-shirt, blue jeans and he had a white tank top underneath the

11  . . . black T-shirt"); *id.* at 250-51, 254 (Melissa Bruno's testimony).  Petitioner has brown hair.

12  Lodged Doc. 2, Augmented Clerk's Tr. 39.  The California Court of Appeal's rejection of this

13  claim was neither contrary to, nor an unreasonable application of, clearly established law, and

14  Petitioner is not entitled to relief on this claim.

15      E.  Ground Five:  Admission of Racial Remark Into Evidence

16      In ground five, Petitioner contends the trial court erred by allowing Petitioner's racial

17  remark into evidence.  Over defense objection, the State was allowed to introduce into evidence

18  that T. A. heard Petitioner say, "Sean, you tell that motherfucking nigger come down here, fight

19  us.  This is bullshit.  They keep messing with us[.]"  Lodged Doc. 3, Rep.'s Tr. vol. 1, 88-89.

20          1.  State Court Decision

21  The California Court of Appeal rejected Petitioner's claim as follows:

22          [Petitioner] separately contends the trial court abused its discretion
            in admitting evidence he made the racial remark set forth above.
23          He argues such evidence "was irrelevant, and whatever relevance it
            did have to the issues in the case was outweighed by its
24          inflammatory nature and its potential to confuse the issues."  (Evid.
            Code, §§ 350, 352.)
25
            We need not decide whether the trial court abused its discretion in
26          admitting such evidence because, as previously discussed, any

                                       39

1
2
error in doing so was harmless beyond a reasonable doubt.  (*Ante*, part I [*Any Defect in T. A.'s Pretrial Or In-Court Identification Of [Petitioner] Was Harmless Beyond A Reasonable Doubt*].)

3   Lodged Doc. 7, at 7-8.

4                 2.  Legal Standard for Admission of Evidence Claim

5           Challenges to a state trial court's evidentiary rulings are not cognizable on federal habeas

6   review unless the admission or exclusion of evidence violated a petitioner's due process right to

7   a fair trial.  *Estelle*, 502 U.S. at 70.  "Only if there are no permissible inferences the jury may

8   draw from the evidence can its admission violate due process."  *Jammal v. Van de Kamp*, 926

9   F.2d 918, 920 (9th Cir. 1991).

10                3.  Analysis of Admission of Racial Remark Into Evidence Claim

11          Here, the California Court of Appeal's decision reasonably indicates that, irrespective of

12  whether the trial court erred in admitting the racial remark into evidence, no prejudice resulted to

13  Petitioner because the record contains ample evidence to support the jury's conviction.  Lodged

14  Doc. 7, at 8.  As stated earlier, Smith testified that Petitioner was her attacker, and Crans

15  recounted that Petitioner struck Smith.  Lodged Doc. 3, Rep.'s Tr. vol. 1, 66, 116-17.  Murphy

16  testified Petitioner asked her to say, falsely, that "[Petitioner] had been with [her] the whole

17  night."  *Id.* at 185-86.  Murphy also told a prosecution investigator that Petitioner had said, "I

18  took care of her," referring to Smith.  *Id.* at 186-87.  Petitioner's jailhouse note shows he wanted

19  to convince Smith not to testify against him.  *Id.* at 178-79.

20          Additionally, Deputy Anderson testified Britt told him that "[Petitioner] hit him in the

21  face."  *Id.* at 114.  Murphy also testified that she saw Petitioner strike Britt.  *Id.* at 181-82.  The

22  jury was already aware that Petitioner made racially offensive comments since the jailhouse note

23  was read to them and admitted into evidence, *id.* at 178-79, and Petitioner acknowledged that the

24  swastika's common meaning involves "World War II Nazi Germany."  Lodged Doc. 3, Rep.'s

25  Tr. vols. 1-2, 299-300.  Petitioner cannot establish that admitting his racial remark resulted in a

26  trial that was fundamentally unfair.  *McKinney v. Rees*, 993 F.2d 1378, 1384-86 (9th Cir. 1993)

1   (citing *Dowling v. United States*, 493 U.S. 342 (1990)); *see also Henry v. Estelle*, 993 F.2d 1423,

2   1427 (9th Cir. 1993).  Petitioner is not entitled to relief on this claim.

3                                          VI.  CONCLUSION

4           For the foregoing reasons, IT IS HEREBY RECOMMENDED that Petitioner's

5   application for writ of habeas corpus be DENIED.

6           These findings and recommendations are submitted to the United States District Judge

7   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Within twenty-one

8   days after being served with these findings and recommendations, any party may file written

9   objections with the court and serve a copy on all parties.  Such a document should be captioned

10  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

11  shall be served and filed within seven days after service of the objections.  Failure to file

12  objections within the specified time may waive the right to appeal the District Court's order.

13  *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153, 1156-57

14  (9th Cir. 1991).  In any objections he elects to file, Petitioner may address whether a certificate of

15  appealability should be issued in the event he elects to file an appeal from the judgment in this

16  case.  *See* Rule 11(a), Federal Rules Governing Section 2254 Cases (district court must issue or

17  deny certificate of appealability when it enters final order adverse to applicant).

18

19

20

21  DATED:          December 14, 2010.

22

23

24                                          _____

25                                          TIMOTHY J BOMMER
                                            UNITED STATES MAGISTRATE JUDGE

26